**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

KITRON A. WEDDING, pro se,

Plaintiff,

v. Civil Action No. 4:25-cv-143-RBS-LRL

HUNTINGTON INGALLS INCORPORATED,

Defendant.

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR EMPLOYMENT DISCRIMINATION, RETALIATION, AND RELATED STATE-LAW CLAIMS**

Plaintiff Kitron A. Wedding ("Plaintiff"), proceeding pro se, files this First Amended Complaint against Defendant Huntington Ingalls Incorporated ("Defendant" or "the Company"), pursuant to the Court's Order of July 23, 2026, ECF No. 16. This Amended Complaint supersedes and replaces Plaintiff's original Complaint, ECF No. 1, in its entirety.

---

## I. PRELIMINARY STATEMENT

1. This action arises from Defendant's treatment of Plaintiff after Plaintiff disclosed a disability and requested a reasonable workplace accommodation, and from Defendant's subsequent response to Plaintiff's complaints concerning harassment, intimidation, and discriminatory treatment.

2. Plaintiff does not contend that every unpleasant event occurring during or after his employment was necessarily caused by Defendant. Rather, Plaintiff alleges specific workplace conduct and alleges that, following his complaints to Defendant and his pursuit of legal remedies, he

experienced conduct that caused him reasonably to fear continuing retaliation. Plaintiff presently does not know the identity of all persons responsible for off-site conduct or the means by which information concerning him was obtained. Those matters are appropriate subjects for discovery.

3. Plaintiff incorporates by reference the exhibits attached to his original Complaint (ECF Nos. 01-1 through 01-11) as if fully set forth herein.

---

## II. THE PARTIES

4. Plaintiff Kitron A. Wedding is an individual who may be served with papers at 1001 Gayley Ave., Unit #24724, Los Angeles, California 90024, and who was employed by Defendant at its Newport News, Virginia facility from April 8, 2019 until his termination on February 23, 2024.
5. Plaintiff is a person with diagnosed disabilities, including Generalized Anxiety Disorder ("GAD") and Major Depressive Disorder ("MDD"), diagnosed on May 24, 2022.
6. Plaintiff is also atheist and identifies as queer, both protected characteristics under Title VII of the Civil Rights Act of 1964.
7. Defendant Huntington Ingalls Incorporated is a corporation doing business in Virginia, with its principal place of business at 4101 Washington Avenue, Newport News, Virginia 23607. Defendant is an employer within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
8. At all times relevant to this action, Defendant employed Plaintiff at its Newport News, Virginia facility.

---

## III. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), and 42 U.S.C. §§ 2000e-5(f)(3) and 12117(a).

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as they form part of the same case or controversy as the federal claims.

11. Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in Newport News, Virginia, within this District, where Defendant maintains its principal place of business and where Plaintiff was employed.

---

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 30, 2024, alleging discrimination based on disability, religion, sex (sexual orientation), and retaliation, in violation of the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964. A true and correct copy of the EEOC Charge is attached as **Exhibit B**.

13. The EEOC issued a Dismissal and Notice of Rights on July 31, 2025, which Plaintiff received on or about that date. The EEOC made no finding as to the merits of Plaintiff's claims and issued a Notice of Right to Sue. A true and correct copy of the Notice of Right to Sue is attached as **Exhibit A**.

14. Plaintiff filed his original Complaint in this action on October 29, 2025, within ninety (90) days of receiving the Notice of Right to Sue. The claims asserted herein are within the scope of the EEOC charge and are based on the same facts and circumstances.

15. To the extent any discrete acts described herein occurred more than 300 days before the filing of the EEOC Charge, Plaintiff alleges that such acts form part of a single, continuing hostile work environment, at least one act of which occurred within the 300-day period preceding the Charge, such that the entire course of conduct is properly considered by this Court under the continuing-violation doctrine established in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115-18 (2002).

16. Plaintiff has fully exhausted all administrative remedies required by the ADA and Title VII with respect to the claims asserted herein.

---

## V. FACTUAL ALLEGATIONS

### A. Plaintiff's Employment and Disability

17. Plaintiff was hired by Defendant on April 8, 2019, as a Mechanical Test Engineer. In October 2020, Plaintiff was promoted to Shift Test Engineer.

18. On May 24, 2022, Plaintiff was diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder by Hampton Mental Health Associates.

19. Plaintiff is a qualified individual with a disability within the meaning of the ADA, and was at all relevant times capable of performing the essential functions of his position, with or without accommodation. Plaintiff consistently met Defendant's performance expectations and completed the optional Radiological Training for Nuclear Engineers ("RTNE") qualification during the

period of harassment described herein following a history of taking on roles of increasing responsibility since beginning employment with Defendant.

**B. Plaintiff's Accommodation Request**

20. On February 10, 2023, Plaintiff informed his manager, Justin Mani, that he was experiencing anxiety and panic attacks related to his job duties, particularly the rotating shift schedule, which was exacerbating his symptoms. Plaintiff requested a reasonable accommodation in the form of a consistent work schedule.

21. On February 28, 2023, Defendant granted Plaintiff's accommodation request and reassigned him to a procedure writing position on first shift.

22. On July 12, 2023, Plaintiff informed Ron Rogers that he was disabled and requested to work from home as an additional reasonable accommodation. Plaintiff stated: "I'm not able to focus on study based on the amount of talking that happens in the office. I have ADHD and anxiety and can provide documentation for both. I need to be at home to work."

**C. Harassment and Hostile Work Environment Following Accommodation**

23. Following Plaintiff's accommodation request and reassignment, Plaintiff's work environment became hostile. Managers, supervisors, and coworkers engaged in harassment, intimidation, rumor-spreading, shunning, and other conduct designed to pressure Plaintiff to abandon his accommodation. Surveillance, harassment, intimidation, and other forms of retaliation continue into the present and now seem more directed at pressuring the plaintiff into abandoning this case or obstructing his ability to bring the case safely.

24. The hostility toward Plaintiff intensified whenever he took steps to document, report, or resist the harassment and this trend continues into the present. When Plaintiff requested Human

Resources contact information, when he began taking notes about workplace conduct, when he wrote down quotes, or when he researched the behavior online, the harassment and intimidation escalated. Similarly, when Plaintiff attempted to print legal documents or mail court-related materials, he experienced worsening repercussions. These events confirmed that Plaintiff's efforts to report and document were being monitored and met with retaliation.

25. On February 22, 2023, a coworker (Carlos Garcia) hid Plaintiff's Yubikey (computer access chip) from him. Other employees watched and laughed as Plaintiff searched for it for over an hour. Plaintiff later learned the Yubikey had been deliberately hidden.

26. Throughout 2023, Plaintiff endured persistent workplace harassment, including coworkers making derogatory comments, excluding Plaintiff from workplace interactions, and making references to Plaintiff's personal life indicating he was being monitored. Despite the ongoing harassment and intimidation, Plaintiff continued to meet Defendant's performance expectations and passed the Radiological Training for Nuclear Engineers ("RTNE") qualification upon retest during this period."

27. During this period, a coworker (on information and belief, Lonnie Ness) made a statement to Plaintiff, in a context involving retaliation, that “the government can be used to make someone's life very difficult.” In the days following this statement, Plaintiff began experiencing escalating workplace monitoring, including coworkers making references to details of his personal life that he had not shared with them. Plaintiff also began being followed in public, including on his commute, and had details of his personal life referenced in workplace emails and casual conversation. Plaintiff understood these observations as an escalation from ordinary workplace harassment to a more organized phenomenon. Plaintiff further understood the coworker's statement as a threat that if he did not comply with Defendant's demands, he would face government-related repercussions. However, the pattern of workplace conduct that followed,

including coworkers referencing personal information obtained through unknown means, demonstrates that Defendant's employees were aware of Plaintiff's private information.

28. On May 24, 2023, Plaintiff documented in his personal notes that he was experiencing "harassment, intimidation, hazing, shunning" in connection with his manager Ron Rogers, Assistant Chief Test Engineer Chris DeHaan, and the ACTE staff. Plaintiff also noted the "old boys club" culture and references to the Plaintiff that alluded to surveillance and intimidation.

29. On or about June 26, 2023, Chris DeHaan stated to Plaintiff in a meeting that "all of the managers were in agreement" and that "people usually break by now." DeHaan and other managers and coworkers discussed how they were "pressure testing" Plaintiff.

30. On July 20, 2023, Plaintiff's manager Ron Rogers told Plaintiff: "I can't tell you not to go on vacation but nobody is going to want to work with you." Rogers made this statement to discourage Plaintiff from taking approved time off.

31. Throughout this period, coworkers and supervisors made persistent comments alluding to Plaintiff's personal life outside of work, including references to specific information regarding the inside of his home, specifically, the titles of books on his office bookshelf, his significant other (referred to by name), his travel plans, information from his internet search history, texts, emails and other personal communications, and his pet dog. Plaintiff reasonably understood these comments as demonstrating that he was being monitored and as an effort to intimidate him.

32. On August 23, 2023, coworker Lonnie Ness told Plaintiff: "You should read the rape of Nanking." This book was on Plaintiff's bookshelf in his home, indicating that coworkers were aware of the contents of his personal residence and were demonstrating this awareness.

33. On August 23, 2023, coworkers engaged in a detailed discussion about drawing and quartering, various torture and execution methods, and indigenous population genocide, within Plaintiff's hearing. That same day, coworker Mike Gustafson asked Plaintiff if he had seen the news about the Russian opposition leader dying in a plane crash.

34. On August 24, 2023, coworker David Roberts loudly stated to Plaintiff as he was walking past his cubicle: "I'm going to knock the stupid out of you." This statement constituted a direct threat of physical violence. This escalation also followed the previous day's recording of evidence.

35. On September 12, 2023, Defendant took an adverse employment action against Plaintiff by reassigning him from writing nuclear procedures to supervising furniture delivery. This humiliating and retaliatory reassignment was designed to demean Plaintiff and punish him for seeking accommodation.

36. On or around December 6, 2023, when Plaintiff began taking notes about the harassment, coworker Dan Thomas stated: "Feel free to scribble." Another coworker was overheard saying: "He's got a list with new stuff by the copier. 10-12 things." These statements confirmed that Plaintiff's note-taking was being monitored.

37. On December 19, 2023, Defendant organized a Christmas party at which Plaintiff was subjected to humiliating hazing. The white elephant gift exchange was organized so that Plaintiff was last and received a cheap flashlight. During the event, coworkers appeared to post lookouts and afterward Plaintiff's vehicle no longer contained his work badge. This followed conversation regarding work employees "having their badges deactivated" and "not being able to get back to work."

38. On January 2, 2024, a vehicle attempted to collide with Plaintiff's car near his workplace. The driver waited at a green light with his turn signal on until Plaintiff approached, then accelerated

into Plaintiff's lane before he passed. Plaintiff was forced to slam on his brakes. The vehicle did not stop or attempt to brake. This scenario mimicked one discussed previously at his place of work before the incident occurred, demonstrating that the speakers had knowledge of the event before it occurred. Plaintiff reported this incident to his supervisor and requested a flexible work arrangement. Plaintiff contacted Human Resources representative, Carrie Allen, requesting to make a report of harassment and stating that he did not feel safe at work.

**D. Plaintiff's Religious Beliefs and Sexual Orientation**

39. During the relevant period, Plaintiff disclosed to coworkers that he was an atheist and identified as queer. Following those disclosures, Plaintiff was subjected to comments and conduct concerning his religious beliefs and sexual orientation. Coworkers with knowledge of these characteristics made hostile remarks targeting his religious beliefs and sexual orientation, contributing to the hostile environment. Plaintiff understood those comments and conduct as unwelcome and discriminatory.

40. The religious and sexual-orientation-related conduct formed part of the same deteriorating workplace environment in which Plaintiff was also experiencing disability-related harassment and intimidation.

41. On January 8, 2024, Plaintiff reported the discrimination, harassment, intimidation, and threatening conduct to Defendant's Human Resources representative, Carrie Allen. Plaintiff provided details of the workplace harassment, the veiled threats, and the pattern of conduct he had experienced since receiving his accommodation, including conduct suggesting that information about his personal life and activities was being monitored or discussed by persons in the workplace, being followed in the workplace, and strange, unwelcome conversations

regarding people at the company who had been alleged of pedophilia. Plaintiff discussed how all of these factors seemed out of place and requested an investigation.

42.Carrie Allen regarded Plaintiff as paranoid and immediately escalated the matter. Allen had Plaintiff escorted by security from the security building, past his workplace, to the medical department. At the medical department, Plaintiff met with Dr. Peter Aposteles, the Medical Director for Defendant. Plaintiff recounted his harassment complaint to Dr. Aposteles. Dr. Aposteles asked Plaintiff if he had "ever heard of throwing stones in glass houses?" then also regarded Plaintiff as paranoid. It is unknown by Plaintiff if any effort was made to investigate the complaints placed with Human Resources on January 8, 2024.

43.On January 8, 2024, Plaintiff was required to sign a "Last Chance Memorandum" and an Employee Assistance Plan ("EAP") agreement.

44.The Last Chance Memorandum stated that Plaintiff was being directed to a mandatory EAP referral and required Plaintiff to "submit to and fully cooperate in whatever treatment program is required by the Employee Assistance Program (EAP) and/or the Company Medical Director." A true and correct copy of the Last Chance Memorandum is attached as **Exhibit E**.

45.The Last Chance Memorandum provided that Plaintiff would be discharged immediately if he "fail[ed] to cooperate fully with the prescribed treatment program." The memorandum also stated that Plaintiff "hereby authorize[d] and consent[ed] to the release by EAP of information" to Defendant.

46.HR described the EAP as an administrative process while they handled Plaintiff's complaint. Plaintiff was told he could not return to work until cleared by the medical director and a psychiatrist.

**F. The EAP and Forced Medical Leave**

47. On January 16, 2024, Plaintiff informed his supervisor that he was on medical leave with an estimated return to work date of March 31, 2024.

48. On January 23, 2024, Plaintiff met with Ron Grett, an EAP counselor and contractor for Defendant (Ron Grett LLC). During this meeting, Grett made the following statements to Plaintiff:

> "You sound like you are experiencing delusions of persecution" and "a classic case"
>
> "Listen Dr. Aposteles believes you are delusional, I do"
>
> "I didn't release your name but I ran the information you gave me by one of my colleagues who is a clinical psychologist. He said, 'Ron, no doubt this guy is completely delusional'"
>
> "You'll never get back to work that way" (when Plaintiff discussed seeing his established provider, Dr. Nixon)
>
> "I don't think you're going to get any better without an antipsychotic in place"
>
> "To be honest with you, Kitron, I don't think you're that important"

49. Grett stated that Defendant's policy required Plaintiff to be cleared by a psychiatrist and the medical director to return to work. Grett also stated that Plaintiff could not return to work unless cleared by Dr. Stephen Cunningham, a psychiatrist chosen by Defendant and its contractor.

50. No written policy was provided to Plaintiff, following multiple requests, demonstrating that Defendant had authority to require Plaintiff to see a specific, company-chosen psychiatrist rather than his own established medical providers.

51. On February 15, 2024, Grett informed Plaintiff that "the medical department and legal department may want you to see the psychiatrist that I use, Dr. Cunningham."

52. On February 19, 2024, Plaintiff emailed Grett to confirm his appointment with his established psychiatrist, Dr. Nixon, at Hampton Mental Health Associates on March 14, 2024. Plaintiff asked Grett what information he needed to provide to comply with Defendant's requirements.

53. On February 20, 2024, Grett replied: "It is HII-NNS policy that you be evaluated and cleared to return-to-work by a psychiatrist. The person that you mentioned is not a physician. I can schedule you with Dr. Cunningham, M.D."

54. Also on February 22, 2024, Plaintiff spoke by phone with Carrie Allen. Allen stated that Plaintiff had to "work in conjunction with" Ron Grett and that Grett worked with Defendant's medical director. Allen told Plaintiff that if Plaintiff's chosen provider cleared him for work, but it was not approved by Grett, it would not count.

55. On February 22, 2024, Grett emailed Plaintiff: "NNS Medical Department and Anthem EAP are requiring you to be evaluated and treated by a Psychiatrist. It is required that you be evaluated by Dr. Stephen Cunningham, M.D. ... If you do not follow these instructions your Mandatory EAP case will be turned over to NNS Human Resources."

56. On February 22, 2024, Plaintiff called Dr. Cunningham's office. The office informed Plaintiff that there was a $250 fee at time of scheduling. Plaintiff informed the provider that he would schedule as soon as his replacement payment card arrived in the mail.

57. On February 23, 2024, before Plaintiff was able to schedule with Dr. Cunningham, Defendant terminated Plaintiff's employment.

**G. Termination**

58. The termination letter, dated February 23, 2024, stated:

> "On February 23, 2024, Newport News Shipbuilding was notified of your failure to follow the requirements and treatment recommendations of your mandatory Employee Assistance Program. The last chance memorandum that you signed on January 8, 2024, states the conditions governing your continued employment with Newport News Shipbuilding. As of February 23, 2024, you have failed to establish an appointment with the required provider after multiple attempts by the EAP coordinator. As a result of your failure to cooperate fully with the prescribed treatment, you have been released from employment with Newport News Shipbuilding effective Friday, February 23, 2024."

A true and correct copy of the Termination Letter is attached as **Exhibit D**.

59. The stated reason for termination was false and pretextual. Plaintiff had engaged in good faith efforts to comply with the EAP requirements, including attending all meetings with Grett, contacting Dr. Cunningham's office and informing the office that he would schedule as soon as payment was available, maintaining contact with his established providers, and repeatedly requesting guidance on how to comply.

60. Plaintiff was terminated more than one month before his approved medical leave return-to-work date of March 31, 2024.

61. During his leave, Plaintiff received short-term disability benefits through Prudential based on information provided by Defendant that Plaintiff was mentally unfit for work.

**H. Retaliatory and Discriminatory Nature of the EAP Process**

62. The EAP referral and evaluation requirement was not a good-faith fitness-for-duty inquiry but a mechanism constructed to manufacture grounds for Plaintiff's termination in retaliation for his January 8, 2024 report and in furtherance of discrimination based on Defendant's perception of Plaintiff as mentally disabled. This is shown by, among other things: (a) Grett's own statements expressing a predetermined belief that Plaintiff was "delusional" before any evaluation occurred; (b) Grett's offer to assist in scheduling Plaintiff's evaluation followed by his failure to do so; (c) the absence of any written policy justifying the requirement that Plaintiff be evaluated by a specific, Defendant-selected provider; and (d) the immediate temporal proximity between Plaintiff's protected report on January 8, 2024 and his removal, referral, and eventual termination.

**I. Continuing Effects and Damages**

63. Defendant's actions caused Plaintiff severe and continuing emotional distress, including fear, anxiety, psychological harm, mental anguish, and exacerbation of his diagnosed anxiety and depression.

64. The retaliation, intimidation, and hostile treatment left lasting effects, including post-traumatic stress symptoms, nightmares, hypervigilance, social withdrawal, and loss of passion for his interests.

65. Plaintiff's reputation and employability have been harmed by Defendant's false statements about his mental fitness.

**J. Post-Employment Conduct**

66. Following his termination, Plaintiff experienced additional conduct that caused him to fear that the intimidation he had reported had not necessarily ended with his employment.

67. Plaintiff has experienced incidents that he reasonably perceived as stalking, threats of gun violence, monitoring, or cyber-stalking.

68. Plaintiff does not presently know the identity of the persons responsible for every such incident.

69. Plaintiff does not presently allege that every post-employment incident was caused by Defendant.

70. Plaintiff alleges that these post-employment events are relevant to the extent they provide context for the intimidation and monitoring concerns that Plaintiff reported to Defendant before his termination.

71. Plaintiff further alleges that Defendant and persons acting on Defendant's behalf may possess information concerning the source, purpose, or coordination of particular communications or conduct that Plaintiff cannot presently identify.

72. Plaintiff seeks discovery concerning those matters to the extent they are relevant to the claims pleaded herein.

73. Plaintiff does not rely upon speculative theories to explain the exact mechanism for observations as independent causes of action in this Complaint.

**K. Witnesses**

74. Numerous employees and managers worked in the same work center as Plaintiff during the relevant period and may possess firsthand knowledge of the events alleged. Potential witnesses include, among others, Justin Mani, Ron Rogers, Chris DeHaan, Carrie Allen, Dr. Peter

Aposteles, Ron Grett, Dr. Stephen Cunningham, Jerry Tice, Alan Wiley, William McKinley, Matthew Simon, Paul Lindgren, Paul Timmons, Christi Jelinek, Joshua Jackson, Phil Shook, Lonnie Ness, Eric Kilner, Michael Alford, Melanie Adams, David Roberts, Dalton, Lindsay Routten, Sean McDonnell, Randy Kingsbury, Tina McGuigan, Amanda Downs, Brianna Thompson, Daniel Thomas, Phil Lyston, Brandon, John Pendergast, Michael Gustafson, Jessica Hairston, Jason Richey, Kyle Best, Benjamin Bond, Matt Benbow, Sarah Meixner, Allan, John, Ryan Taylor, and Morgan Hotz. Additional witnesses will be identified through discovery.

---

## VI. CAUSES OF ACTION

### COUNT I: DISABILITY DISCRIMINATION

**Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.**

75. Plaintiff incorporates by reference paragraphs 1 through 74 as if fully set forth herein.

76. Plaintiff is a qualified individual with a disability within the meaning of the ADA, as he has diagnosed Generalized Anxiety Disorder and Major Depressive Disorder, which substantially limit one or more major life activities, including but not limited to thinking, concentrating, sleeping, and working.

77. Plaintiff was regarded by Defendant and its agents as having a disability, as demonstrated by the statements of Carrie Allen (Plaintiff "sounds paranoid"), Dr. Aposteles (Plaintiff "sounds paranoid"), Ron Grett (Plaintiff has "delusions of persecution," is "completely delusional"), and Grett's referral to a colleague who stated Plaintiff was "completely delusional." The disability was also acknowledged in verbal conversation with Plaintiff’s manager, Justin Mani during a performance review on or around February 10, 2023, in multiple text messages between

Plaintiff and his managers Justin Mani and Ron Rogers, and by the granting of the accommodation, initially.

78. Plaintiff requested a reasonable accommodation on February 10, 2023, which was granted. However, Defendant thereafter subjected Plaintiff to harassment and intimidation that was directly related to his disability and accommodation, and ultimately terminated him because of his disability and perceived disability.

79. Defendant discriminated against Plaintiff based on his disability and perceived disability by subjecting him to a hostile work environment and harassment; coercing him onto unnecessary medical leave; forcing him to sign a Last Chance Memorandum; requiring him to see a company-chosen psychiatrist rather than his own providers; and terminating his employment on a pretextual basis.

80. Defendant's actions constitute unlawful discrimination based on Plaintiff's actual and perceived disability in violation of the ADA, 42 U.S.C. § 12112(a).

---

**COUNT II: RETALIATION**

**ADA and Title VII, 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 12203(a)**

81. Plaintiff incorporates by reference paragraphs 1 through 80 as if fully set forth herein.

82. Plaintiff engaged in protected activity under the ADA when he requested a reasonable accommodation on February 10, 2023.

83. Plaintiff engaged in protected activity under the ADA and Title VII when he reported discrimination, harassment, and intimidation to Human Resources on January 8, 2024.

84. Defendant took adverse employment actions against Plaintiff in retaliation for his protected activity, including but not limited to:

A) Harassment, intimidation, and hazing following his accommodation request

B) Threats of physical violence

C) A threat communicated by a coworker (on belief, Lonnie Ness) that 'the government can be used to make someone's life difficult,' which Plaintiff reasonably understood as a threat of government-related retaliation if he did not abandon his accommodation.

D) Retaliatory reassignment to supervising furniture delivery

E) Removal from the workplace via spectacle

F) Coerced medical leave

G) Forced signing of Last Chance Memorandum

H) Termination of employment

85. The adverse actions occurred within weeks or hours of Plaintiff's protected activity and were caused by Plaintiff's protected activity.

86. The stated reason for Plaintiff's termination, "failure to comply" with the EAP," was false and pretextual. Plaintiff made good faith efforts to communicate and comply and instead was terminated before he was able to complete the required steps.

87. Defendant's actions constitute unlawful retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a), and the ADA, 42 U.S.C. § 12203(a).

**COUNT III: RELIGIOUS AND SEXUAL ORIENTATION DISCRIMINATION**

**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)**

88. Plaintiff incorporates by reference paragraphs 1 through 87 as if fully set forth herein.

89. Plaintiff is atheist, which constitutes a sincerely held religious belief and is protected under Title VII.

90. Plaintiff is queer, which constitutes a protected characteristic under Title VII's prohibition on sex discrimination as established by the Supreme Court in *Bostock v. Clayton County*, 590 U.S. 644 (2020).

91. After receiving his accommodation, Plaintiff disclosed his atheist beliefs and his queer identity to his coworkers.

92. Following these disclosures, Defendant and its agents made hostile remarks about Plaintiff's religious beliefs and sexual orientation, employed the use of slurs and derogatory terms, mocked his beliefs, and treated him less favorably than other employees.

93. Defendant's conduct created unequal conditions of employment and contributed to a hostile work environment that culminated in Plaintiff's termination.

94. Defendant's actions constitute unlawful discrimination based on religion and sexual orientation in violation of Title VII, 42 U.S.C. § 2000e-2(a).

---

**COUNT IV: HOSTILE WORK ENVIRONMENT**

**ADA and Title VII**

95. Plaintiff incorporates by reference paragraphs 1 through 94 as if fully set forth herein.

96. Following Plaintiff's accommodation request, he was subjected to severe and pervasive harassment, intimidation, and threatening conduct based on his disability, religion, and sexual orientation.

97. The harassment included:

A) Derogatory and mocking comments about Plaintiff's medical condition

B) Threats of violence, including "I'm going to knock the stupid out of you"

C) Comments alluding to private details describing Plaintiff's personal life, indicating he was being monitored

D) Intimidation and veiled threats

E) Exclusion from workplace activities, training, information, access to software, projects, work-sponsored vacations, and other more social forms of shunning

F) Deliberate hiding of Plaintiff's Yubikey (computer access chip) and ridicule while Plaintiff searched for it among other instances of hiding personal property or work-related items such as moving a laptop from its storage location

G) Being followed at work for months, including into private settings such as the restroom

H) Being monitored including monitoring of Plaintiff's note-taking about workplace harassment, including being told 'Feel free to scribble' and an overheard reference to Plaintiff's “list of incidents" while recording incidents at his desk

I) Prolonged references to, vivid descriptions of, and conversations about: torture, genocide, rape, pedophilia to include information regarding alleged acts by members of management, execution, physical assault, assault with weaponry including blunt or sharp hand weaponry, assault with firearms, jumping, ambush, and specifically “waiting

enough time until suspicion had passed" before enacting veiled threats, and "making [them] appear accidental" in addition to other disturbing topics. These were made in a way which implied harm to Plaintiff through emphasis and vocal intonation, without directly threatening.

J) Hazing and humiliation, including badge theft, displacement or disposal of personal items, and humiliation at work parties/events

K) Retaliatory reassignment to demeaning duties

98. The harassment was severe or pervasive, and sufficiently serious to alter the terms and conditions of Plaintiff's employment and create an abusive working environment.

99. Management was aware of the harassment, including through Plaintiff's report to Human Resources on January 8, 2024, but failed to take corrective action. Instead, Defendant removed Plaintiff from the workplace, forced him into medical leave, and terminated his employment.

100. At least one act comprising this hostile environment, the events of January 8, 2024 and thereafter, occurred within 300 days of Plaintiff's EEOC Charge, rendering the entire course of conduct actionable under the continuing-violation doctrine.

101. The Fourth Circuit recognizes a hostile-work-environment cause of action under the ADA and applies a severe-or-pervasive standard to disability-based harassment. Fox v. General Motors Corp., 247 F.3d 169, 176-77 (4th Cir. 2001). Defendant's actions constitute unlawful hostile work environment in violation of the ADA, 42 U.S.C. § 12112, and Title VII, 42 U.S.C. § 2000e-2. .

## COUNT V: DEFAMATION

### Virginia Common Law

102.Plaintiff incorporates by reference paragraphs 1 through 101 as if fully set forth herein.

103.Defendant, through its agents Ron Grett, Dr. Peter Aposteles, and Carrie Allen, communicated false statements about Plaintiff to third parties.

104.On January 23, 2024, Ron Grett told Plaintiff: "You sound like you are experiencing delusions of persecution." Grett also told Plaintiff: "Listen Dr. Aposteles believes you are delusional, I do." Grett relayed that a clinical psychologist colleague had stated: "No doubt this guy is completely delusional." Grett also told Plaintiff: "I don't think you're going to get any better without an antipsychotic in place."

105.These statements were false, as Plaintiff was not delusional and was not experiencing delusions of persecution.

106.The statements were made with reckless disregard for the truth. Grett, Aposteles, and Allen made these statements without proper medical evaluation and for the purpose of justifying Defendant's discriminatory and retaliatory actions.

107.Upon information and belief, Defendant communicated false statements concerning Plaintiff's mental condition or fitness for work to third parties, including Prudential Insurance and others involved in Plaintiff's medical leave, disability benefits, and EAP process.

108.Plaintiff does not presently possess all of the records concerning those communications because they are in the possession or control of Defendant, its agents, contractors, insurers, or third parties.

109. The statements were unnecessary to any legitimate business purpose or medical necessity and were made to coerce Plaintiff, justify his forced medical leave, and provide a pretext for his termination.

110. These false statements have caused harm to Plaintiff's reputation and employability.

111. Defendant's actions constitute defamation under Virginia common law.

---

**COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Virginia Common Law (Pled in the Alternative Under Fed. R. Civ. P. 8(d)(2))**

112. Plaintiff incorporates by reference paragraphs 1 through 111 as if fully set forth herein.

113. In the alternative, and to the extent the conduct above is found not to violate the ADA or Title VII, Defendant's conduct was extreme and outrageous.

114. Defendant's conduct included:

A) Harassment, intimidation, humiliation, and threats

B) Requiring Plaintiff to sign a Last Chance Memorandum under duress

C) Forcing Plaintiff onto medical leave after a security escort outside of his normal workplace based on unsupported medical assessments that were adopted without proper evaluation and used as pretext for discrimination and retaliation

D) Terminating Plaintiff for "failure to comply" despite his good faith efforts

E) Using medical and administrative processes as weapons to discriminate and retaliate

115. Defendant's conduct was intended, or was substantially certain, to cause severe emotional distress to Plaintiff.

116. Plaintiff suffered severe emotional distress, including continuing anxiety, fear, psychological harm, post-traumatic stress symptoms, nightmares, hypervigilance, and social withdrawal.

117. Defendant's actions constitute intentional infliction of emotional distress under Virginia common law.

---

## VII. RELIEF

Plaintiff seeks all relief permitted by law for violations of the ADA, Title VII, and related state-law claims, including but not limited to the following:

118. Plaintiff respectfully requests that the Court:

A) Award back pay, lost wages, lost benefits, and front pay in lieu of reinstatement;

B) Award compensatory damages for emotional distress, pain and suffering, mental anguish, loss of enjoyment of life, and other non-economic harms resulting from Defendant's conduct;

C) Award punitive damages to deter and punish willful or reckless discrimination and retaliation;

D) Award pre- and post-judgment interest and all other appropriate monetary relief, including reimbursement for out-of-pocket costs, medical expenses, and denied unemployment benefits;

E) Order injunctive relief directing Defendant to:

i. Implement and maintain comprehensive anti-harassment, anti-retaliation, and reasonable-accommodation policies;

ii. Conduct company-wide annual in-person training for all employees on recognizing, preventing, and reporting discrimination, harassment, and retaliation, and on employees' rights under the ADA and Title VII;

iii. Establish clear written procedures for employees to document and report discrimination, harassment, and retaliation without fear of reprisal;

iv. Post notice of this Court's judgment and of employees' rights under federal and state anti-discrimination laws;

v. Issue declaratory relief stating that Defendant's actions violated Plaintiff's rights under the ADA and Title VII;

F) Award Plaintiff his litigation costs, expenses, and any reasonable attorney's fees permitted by statute; and

G) Grant such other and further relief as the Court deems just and proper.

---

**VIII. CERTIFICATION**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Amended Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the Amended Complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date: ___8/24/26_______



**Kitron A. Wedding, Pro Se Plaintiff**

1001 Gayley Ave, Unit #24724

Los Angeles, CA 90024

(336) 447-0584

samphone2025@proton.me

**CERTIFICATE OF SERVICE**

I hereby certify that on this _24_ day of August, 2026, a true and correct copy of the foregoing **Plaintiff's First Amended Complaint** was mailed via first-class mail, postage prepaid, to:

Sharon Kerk Reyes

Kaufman & Canoles, P.C.

150 West Main Street, Suite 1400

Norfolk, VA 23510

---

Kitron A. Wedding

Pro Se Plaintiff

1001 Gayley Ave, Unit #24724

Los Angeles, CA 90024

(336) 447-0584

samphone2025@proton.me